*ORLEANS NAVIGATION COMPANY* vs. *MAYOR*

*&c. OF NEW-ORLEANS. ANTE P. 10.*

Servitudes      THIS  case was now  argued  before  the three
are  like  in- judges.
corporeal
heredita-      *Moreau* for  the defendants.
ments and do
not pass        THE defendants have  the right to  continue to
without  a    drain the waters of the city through the canal Ca-
grant.        rondelet, unless the  plaintiffs furnish them another
drain at their own expense.

1st.  BECAUSE they are the owners  of the spot
on which the canal Carondelet  is dug, or  have at
least the right to  enjoy it,  as making a part of the
commons of the city :

2dly.  BECAUSE  they are entitled to the use of
that service by the situation of the place.

I.  THE defendants are owners,  or have the use,
of the  spot of the canal, as making a  part of the
commons.

THERE existed commons under the French and
Spanish  government.

SEE the *procès verbal d'Olivier Devesin*, the
surveyor-general  of  the  province  of  Louisiana,

made on the 14th of July, 1763, by order of the
king of France, to survey the plantation of the Je-
suits (now the suburb St. Mary) when the proper-
ty of the Jesuits was forfeited to the crown—the
deliberations of the cabildo—the royal schedule of
the king of Spain, dated the 21st December, 1797.

Those documents shew that the defendants
had a title to the exclusive use of those commons.

Recognitive acts, when supported by a pos-
session of thirty years, dispense of shewing the
primitive title. *Civil Code*, 308, 310, *art.* 237.

The canal Carondelet was included in the com-
mons of the city.

1st. The *procès verbal* of Devezin, says that
the commons of the city extended in their depth
as far as the bayou St. John:

2dly. The royal schedule of the 21st of Decem-
ber, 1797, says that the three hundred toises to be
rented and divided in small lots, were to be taken
out of that part of the commons *which were, dur-
ing six months of the year, covered with water*,
a description which, according to the evidence,
could only apply to the low spot where the canal
Carondelet is situated.

3dly. The deliberation of the cabildo under the
date of the 13th March, 1795, granting three hun-
dred square feet of the commons, to Alex. Baudin,
for a certain time and for public utility, says that

SPRING 1812.
I. District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c.
OF NEW-OR-
LEANS.

" *the canal Carondelet is situated on the commons* "*of the city.*"

THIS deliberation is signed by the Baron de Carondelet, as president of the cabildo. Let us enquire—in what consisted this right of commons?

WHAT constitutes the right of commons in France? 3 *Encyclopédie de Jurisprudence*, 74, *verbo Communes.*

IN France commons may be held either in ownership or only in use. 3 *Encyclopédie de Jurisprudence* 76, *verbo Communes.*

WHEN the lords who granted that right, had not divested themselves of their property, they were allowed to take a third part of the commons, for their separate use.

IN the year 1667, the king of France solemnly renounced that right on the commons held under the crown : he rendered an ordinance for that purpose. 3 *Encyclopédie de Jurisprudence*, 77, *verbo Communes.*

ROYAL ordinances and edicts extended their effect as far as the bounds of the empire, and therefore were in force in the French colonies. *Recueil des Edits et ordonnances royaux par Neron et Girard. Introduction, p.* 1.

UNDER the Spanish government, the cabildo made regulations to prevent the usurpations which were made on the commons of the city by several individuals, and to secure to the inhabitants of

New-Orleans, *the right of cutting wood thereon.*
*Arrêté of the Cabildo, dated the 15th July,* 1796.

THE cabildo granted temporarily some parts of
the commons for public utility.

A GRANT was made to Alex. Baudin, of a
tract near the canal Carondelet, on the 13th
March, 1795. *See translations of documents*
*numb.* 2.

THE cabildo vested sometimes a part of the
commons for the benefit of the city.

AN ordinance or *arrêté* was issued on the 5th
October, 1792, by the cabildo, on the suggestion
of governor Carondelet, by which they ordered to
inclose certain parts of the commons, to be rented
to the butchers for the benefit of the city.

A GRANT made by the king of Spain himself
to one Bermudez, on the 3d May, 1799, which
proves that the assent of the cabildo was necessary
for such grants, even when they were made for
public utility, and that when the condition or the
express purpose of the grant was not fulfilled, the
cabildo had the right to remove the grantee, and to
cause the premises to return to their former nature
of commons.

THE king himself, and therefore congress, had
not the right to deprive the inhabitants of New-
Orleans of the use of their commons, without their
consent.

D p

SPRING 1812.
I. District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c.
OF NEW-OR-
LEANS.

COMMONS make undoubtedly a part of the things belonging to a community or corporation.

THINGS held in common by a corporation or community, are subject to the same rules as the goods held in common by the whole nation. *Vattel's Law of Nations*, 170, *numb.* 234 *and* 235.

THE sovereign has a right over public and common things, and they make a part of the royal domain, *Vattel*, 174, *numb.* 245 & 246—but he cannot alien or dispose of the public property, and if he alien or dispose of it, the alienation will be invalid. *Vattel*, 178, *numb.* 259 *and* 260.

THE law, 30*th, t.* 18, *partida* 3, declares without effect, the grants made by the king to the prejudice of the corporations or communities, unless he manifests a second time his intention to be obeyed.

THE law, 2*d, tit.* 5, *book* 7*th*, of the recopilation of Castille, which is posterior to the laws of the *partidas*, declare absolutely null, all grants made by the king, of things belonging to the corporations or communities.

THE rights which the city held under the former governments, were confirmed by an act of incorporation, of the legislative council, dated the 17th February, 1805, *sect.* 13, and afterwards by an act of congress, dated 3d March, 1808, which recognises and confirms the right of the city to

three hundred toises of the commons out and from the fortifications.

SPRING 1812.
I. District.

ORLEANS
NAVIGATION
COMPANY
vs,
MAYOR, &c.
OF NEW-OR-
LEANS.

THE right of the city to the commons, cannot be affected by the charter of the Navigation Company, which is posterior to the act of incorporation, having been enacted but on the 3d of July, 1805.

THESE rights cannot be affected by the renunciation required by the act of congress, since this renunciation relates only to the land which lies between the basin and the river.

THEY cannot be affected, even impliedly, by the shares which the corporation have taken in the stock of the Navigation Company, since the charter has not vested them with the property of the soil, but only with the right to improve the navigation of the canal.

II. THE defendants are entitled to the service which they exercise on the canal Carondelet by the situation of the place.

SERVICES originate not only from covenant or prescription, but also from the nature of the things. *Civil Code*, 127, *art*. 3. *Domat*, 207, *numb*. 5, *of services, English translation*.

THE land situated below, must receive the waters which run naturally from the land above. *Civil Code*, 128, *art*. 4, *Digest, book* 39, *tit*. 3, *law*

SPRING 1812.
I. District.

ORLEANS
NAVIGATION
COMPANY
vs.
MAYOR, &c.
OF NEW-OR-
LEANS.

1st, sect. 13 & 22, and law 2d. Ibid. Traité des Servitudes, 494, 496, 497.

THE proprietor above can do nothing whereby the natural service, due by the land below, may be rendered more burthensome. Civil Code, 128, art. 4.

BUT the proprietor above may choose or assign the place where his canal is to pass. Digest, book 43, tit. 20, law 8. Traité des Servitudes, 563.

THE Civil Code is not repugnant to this assignment, since it presupposes it, when it speaks of the right which the owner of the land, subject to the service, has to change the place of it. Civil Code, 140, art. 64.

IF the primitive place of the service becomes inconvenient, the owner of the land subject to the service, may offer another place equally convenient for the exercise of it, and the owner of the land, to which the service is due, cannot refuse it. Civil Code, 140, art. 64.

THO' the Navigation Company be not the proprietors of the land adjoining the canal, they cannot be dispensed from furnishing to the defendants another place of drain, if they will not receive the waters of the city through the canal Carondelet.

THEY may buy the necessary lands from the neighbouring owners, and if these owners refuse to sell the same, they may compell them to do it, on account of public utility. Civil Code, 102, art. 2,

which is agreeable to the 7th article of the amend-ments of the constitution.

THE Navigation Company cannot be at liberty to change the place of the service, by offering only another convenient place, but they must furnish another canal of drain at their expence.

SPRING 1812.
I. District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c.
OF NEW-OR-
LEANS.

1st. BECAUSE the canal Carondelet was dug, at least for three fourth parts of the work, by the negroes of the city and its jurisdiction, within 15 miles.

2dly. BECAUSE it was dug by the consent of government, under whose title the plaintiffs claim, for the double purpose of navigation and of drain-ing the waters of the city and neighbourhood. See *publications made by order of the Spanish govern-ment on the 26 May, 1794, 15 Sept. 1795, 19 Oct. 1795, & 9 December, 1795.*

IT is immaterial whether it be difficult, or even impossible, to have a canal of navigation, by con-tinuing to drain the waters of the city through the canal Carondelet (though this impossibility has not in any manner been proved); the only enquiry is, whether or not the government intended that this canal should serve for this double purpose, and in-duced thereby the citizens to lend their negroes for that work.

IT is true that in the publication made the 26th May, 1792, it is said that "by the time the canal " Carondelet will be changed into a canal of navi-

SPRING 1812.
I. District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c.
OF NEW-OR-
LEANS.

" gation," but these words were so little intended to exclude the draining of the waters, that in the publication made the 9th December, 1795, when the canal was nearly completed, so as to be navigable for schooners, the baron repeats that the inhabitants shall have thereby the benefit of draining *their stagnant waters.*

FROM its natural situation, all the land beyond the city, was liable to receive its water. By the convention which has taken place, every part of the land, except the spot on which the canal is dug, was freed from the natural servitude, which affected the king's property, as well as that of individuals.

IF the king had been the owner of all the land between the city and the bayou St. John, a navigable stream, he would have been bound to afford a way, though he might, like an individual, have required compensation : for he is liable to the laws as well as his subjects. 1 *Partida, l.* 15 & 16.

THE Court has said the servitude is not to be considered as a natural one, because created by the act of man : they have confounded the *right* with the *means* of exercising it. The owner having consented to the exercise of the right, on a particular spot, does not alter or change its nature.

THE intention of the king, in digging the canal, was, in some degree, to rid the rest of his land

from the natural servitude with which it was bur-
thened. The United States have succeeded to his
rights, and transferred them to the plaintiffs, *cum* Orleans
Navigation
Company
*vs.*
Mayor, &c.
of New-Or-
leans.
*onere.*

HAD the United States sold the land by par-
cels, the purchasers, might have resisted the return
of things to the ancient form : and rightly claimed
to hold these lands free from the burthen from
which the king of Spain, in whose rights they
would stand, had freed them. Is the case different
because one corporation has acquired the whole ?

THE Court, in my humble opinion, erred in
considering the servitude as created by the act of
man. One party cannot raise a dam to stop the
water, nor the other any work by which the bur-
then of the inferior estate may be encreased. *The
work of man* does not refer to a *canal* dug, since
the owner may do it at his expence.

MATHEWS, J. The canal was made by him by
whose authority it was dug : the king of Spain,
not the city.

*Moreau,* continuing. The Court also erred in
determining this case on a principle of the com-
mon law of England, not applicable to us, in con-
tradiction to the *lex loci.*

MATHEWS, J. It was at least on a principle con-
sonant to reason. The right, having no corporal

SPRING 1812.
I. District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c.
OF NEW-OR-
LEANS.

existence, could not be transferred by *delivery*, it must therefore pass by *grant*.

*Moreau*, continuing. The civil law knows not this distinction between corporal and incorporal rights. *Both* pass by *delivery*. No grant was necessary.

NEITHER was the Court correct in saying the city cannot take advantage of a contract, in which it did not intervene as a party. It does not represent, but has succeeded to the rights of, those by whose aid the king was enabled to dig the canal.

IF the sovereign cannot vest any property or right in a city without a grant, that of New-Orleans may be deprived of every part of its property : for it has no grant. The ground on which this hall stands, that on which the church was built, the jail, the hospital, all have passed without a grant.

MATHEWS, J. No person to accept.

*Moreau*, continuing. The three hundred toises around the fortifications, were not accepted by the cabildo, yet congress have recognised the right of the city, and confirmed their title.

MATHEWS, J. The sovereign can revoke his gift. The United States have done so, by granting to the present plaintiffs a right incompatible with that claimed by the city. The city cannot

complain, for congress gave it property of much greater value.

SPRING 1812.

I. District.

ORLEANS
NAVIGATION
COMPANY
vs.
MAYOR, &c.
OF NEW-OR-
LEANS.

*Moreau*, continuing. The cabildo represented the city, and draining its streets being an object of public concern, might claim from the king the priviledge of emptying the waters of the city, over the king's land, into the bayou. The city council, having succeeded to that body, may lawfully claim a continuance of a right which the cabildo might insist upon.

THE defendants have a strong claim on the score of equity. The king said his situation, on account of the war, compelled him to set bounds to his munificence. He was unable to dig the canal without the help of the inhabitants of the city. He solicited that. Negroes, cash, were supplied by the wealthy; actual personal labour by the poor. This is surely a valuable consideration.

MATHEWS, *J.* This consideration has been repaid. The use, which the city has had till now, was more than an equivalent.

*Moreau*, continuing. The consideration a party gives, whatever it may be, entitles him, not to an equivalent, but to every thing that is promised, every thing in the expectation of which the consideration is furnished.

THE Baron de Carondelet, in his last commu-

E E

SPRING 1812.
I. District.

ORLEANS
NAVIGATION
COMPANY
vs.
MAYOR, &c.
OF NEW-OR-
LEANS.

nication, acknowledges the proposed advantages were to be *perpetually* enjoyed. " A service of " little moment which, however, will *rid them* " TOTALLY of the stagnating waters, and conse- " quently of the sickness so common in the fall." *Ante* 12.

THE incompatibility of the use of the canal for the purpose of navigation, and that of a drain, does not destroy the contract. For the incompatibility of these two uses, does not exist in regard to *impossibility*, but in regard to *difficulty* and expence.

THE Baron told *Metzinger* " the canal was " dug for the conveyance of the waters of the city, " as well as for the purpose of navigation, and " must answer both the intended objects." *Ante* 13. The Baron intended to increase the canal to double its width, and to have a *marie salope*, to keep it clean. Persons of the art have declared that, with these improvements, the canal might well serve for both the intended purposes. See *Tanesse* and *Castanedo's* testimony. *Ante* 15.

THE impossibility which avoids the obligation of a contract, must be an absolute one. Great difficulty, trouble and expence, do not.

ORIGINALLY the servitude existed over the whole land; by the consent, nay, the act of both parties, and for their mutual interest and convenience, it has been altered. If now the private in-

terest or convenience of either party, requires an-
other change, let the alteration be made at the ex-
pence of the party to be benefited thereby.

THE counsel for the plaintiffs declined replying.

CUR. ADV. VUTT.

THE Court, a few days after, delivered their
opinion:

MATHEWS, J.† This suit having been twice
heard, and determined on its merits, is now again
to be decided on a motion for a new trial. Was
it not for the great pains and labour, used by the
dissenting judge, in giving his opinion or argu-
ment in opposition to the decision of the Court, it
might be sufficient barely to say, that we can per-
ceive no good grounds for altering our former
judgment.

THE defendant's counsel, and the learned judge
in opposition, having abandoned all pretensions to
an absolute title to the disputed property itself, and
reduced their whole claim to that of a servitude,
this alone we are bound to notice or examine.

IT is a little surprising, that one brother judge
should seem to turn, with apparent disgust, from
any expressions drawn from the common law, to
ascertain the character, or name, of the right claim-

SPRING 1812.
I. District.

ORLEANS
NAVIGATION
COMPANY
vs,
MAYOR, &c.
OF NEW-OR
LEANS.

---

† Judge Mathews had the politeness to favour the re-
porter, with the manuscript, from which his opinion is
printed.

Spring 1812.
I. District.

Orleans
Navigation
Company
vs.
Mayor, &c.
of New-Or-
leans.

ed by the defendants, as the character and name thus deduced, is not only that of the common law, but of common sense, and also of the Roman law, from which he insists on drawing all authority, for the decision of the present cause ; and we are surprised that in quoting the institutes, *lib.* 2, *s.* 3, he did not observe, in the title immediately preceding, and on the same page, *de rebus corporalibus et incorporalibus,* in which it is said, *ss.* 2, *incorporales sunt quæ tangi non possunt, eodemque numero sunt jura prædiorum urbanorum et rusticorum, quæ etiam* SERVITUTES *vocantur.* That a servitude is properly termed an *hereditament,* or that which may be inherited or succeeded to, we believe will not be denied on any hand ; and here it may be observed that, in our view, it is very immaterial whether we named things by the common or civil law, if the names are proper according to the rules of common sense and common parlance ; and it is quite unnecessary, being the same in both systems of laws, to enquire whether they have been established by the *dictum* of a Roman prætor, the edict of an emperor, or denominated by a learned English law-writer.

The first position, laid down by the judge dissenting, is, *jus cloacæ mittendæ servitus est ;* true, and a very dirty one it is, as it relates to those persons bound to submit to it ; and being so burthensome, those claiming such servitude,

ought very clearly to establish their right, before
it should be allowed to them.

Orleans
Navigation
Company
vs.
Mayor, &c.
of New-Or-
leans.

He next goes on to shew how servitudes are established, and for this purpose cites the Institutes as above stated, wherein it is said " *si quis* " *velit vicino aliquod jus constituere pactionibus* " *atque stipulationibus, id efficere debet;*" also, that a testator may, to the prejudice of his heir, burther his farm with a servitude.  The latter clause of this authority, having no bearing whatever on the case before us, we pass in silence. The first sentence comes completely in aid of the opinion of the Court, for we have not been able to discover any pact, or stipulation, by which the defendants have established their right to the servitude claimed: still believing that, to all contracts, agreements and stipulations, two parties are necessary in some shape or other.

It is said and insisted on, " that permission and " forbearance establish servitudes," and in support of this position, is cited the digest, *b.* 8, *s.* 3, where it is stated *traditio plane et patientia servitutum inducet officium praetoris;* and here it might be observed, that the judge is a little unfortunate, after having thrown aside the common law, as affording no legitimate aid to the determination of this cause, to 'ave fallen on a sentence in the Roman law, which it is almost impossible to understand, except by the assistance of a commen-

SPRING 1812.
I. District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c.
OF NEW-OR-
LEANS.

tator, who has been obliged to give it a totally new structure, in order to make it intelligible ; and says that it ought to be thus read, *patientia plane, ut traditione, servitutem inducet officium prætoris ;* which, we suppose, may be thus construed, " by " long and open forbearance, *as by being trans-* " *mitted from one to another*, it is the duty of the " prætor to consider it a servitude ;" this right must partake of the nature of prescription, and to end all discussion on this point, it is sufficient to observe that, against the sovereign, prescription cannot run.

WITHOUT determining on the correctness or incorrectness of the judge's second proposition, in which he states that " a right may vest in a person, " natural or corporate, without any covenant or " agreement of such a person," it will suffice to shew, that the authorities brought in support of it are not applicable to the present cause.    To effect a proper application of the citation from *Pothier* to this suit, it is necessary to shew that the Baron Carondelet had a right to burthen the royal do_ main with servitude, or to alter and modify those which existed by nature.    It is not contended that he had such a power, arising from his office as governor, nor does it appear that he had any spe- cial authority to convey, or give in any manner, the right now claimed by the city ; such a power can only be dubiously implied from one of the

official papers laid before the Court, which states
that "the expences of the war, precluding the
" hope that the royal treasury would contribute
" to the expence of a considerable canal of navi-
" gation, government had only solicited the king
" to allow the convicts (that were about to be
" transported to Pensacola) to remain in New-
" Orleans, engaging with their aid, and that of
" several inhabitants zealous for the *public* good,
" to dig *a canal for draining*, which will be
" changed in successive years into a canal of navi-
" gation for schooners."

It seems to us, from this paper, that the inten-
tion of the governor, and his master the king, had
been to make a *considerable canal* of navigation;
but the deficiency in the public funds, rendering
it impossible at that time to execute so expensive
a project, they were content that the city of New-
Orleans might aid in making, for the present, a
canal for draining—permitting them to use it for
that purpose, until it should be convenient to
render it fit for the first great end intended—*a ca-
nal of navigation.* Now if the Baron had no right
to give, grant or sell a servitude, the doctrine of
the " *actio utilis*" cannot be made to touch the
present cause, for the donor having no power to
give, the donation itself fails, and every correlative
must fall with it, and the party for whose be-
nefit it was intended, can claim nothing by the

SPRING 1812.
I. District.

ORLEANS
NAVIGATION
COMPANY
vs.
MAYOR, &c.
OF NEW-OR-
LEANS.

gift.    But admit that the governor had a right to give, grant, or stipulate relative to servitudes on the public domain, is there stronger evidence that he stipulated with those individuals who gave the service of the negroes, that the canal should forever remain a sewer for the city, than that it should be made a canal of navigation?   If we recollect the testimony correctly, it appears to have been intended more for the latter purpose than for the former; indeed it appears, that the primary object and ultimate end of all concerned in it, was to make it a canal of navigation. We are of opinion that it cannot answer the two-fold use of a common sewer to the city, and of a navigable canal; and that the community must lose all the advantages which might be derived from its navigation, or the city must desist from using it as has been heretofore done, and as there is no contract or stipulation, vesting in the corporation the right which they claim, they have no legal pretensions to the servitude as arising from grant or contract.

But it is said they have a right *ex natura loci,* because the canal is on land lower than that on which the city stands, and that by the civil law the lower ground owes a natural servitude to the higher, to receive its waters, and that the judgment of the Court is erroneous in requiring evidence of a grant of this right, which arises from the nature of the place.   It is true that the owner of the lower

ground is bound to receive the water running
from that of the superior landholder; but it must
be received as it flows by the course of nature,
and cannot be altered or modified except by com-
pact or agreement betwixt the parties interested,
and it would be proper to require the same power
to change and modify a right, as to grant it origi-
nally. It is equally true that we have it in evi-
dence, that all the lands immediately behind the
city are lower, and naturally receive the water of
it; they receive it as an inclined plane, each space
receiving the water immediately descending on it,
there stagnating, and not flowing in any particu-
lar stream or direction, except in very high wa-
ter; and it is said, that because *quacunque servi-*
*tus Fundo debitur, omnibus ejus partibus debitur,*
therefore, the owner of the inferior land cannot
free any part of it from the servitude.    True, the
canal must bear its proportion of the natural servi-
tude, and we suppose that the plaintiffs would ne-
ver have complained, were it not for the attempt
to make them submit to the whole drainings of
the city from one end to the other, whereas by na-
ture they are only bound to receive such portion
of the water as would occupy an extent on the
upper ground, equal to the width of the canal on
the lower.

WE are not able to feel the force of the objec-
tion made by the dissenting judge, to favouring

F F

Spring 1812.
I. District.

Orleans
Navigation
Company
vs.
Mayor, &c.
of New-Or-
leans.

the pretensions of the plaintiffs, because they are mere donees or volunteers. The donee certainly succeeds to all the rights of the donor, as well as to the burthens on the thing given. Suppose the United States still held their right to the canal, and granted to the city, as they have done all the balance of the land in its rear to the distance of 600 yards, with what just or equitable pretensions could the defendants insist on the exercise of a servitude on the part retained, which was only due by the whole commons, and that to the utter destruction of the part retained, for the purposes intended by its retention, or with what face could they demand of the general government to give them another canal, when they have granted to them the very land through which it must pass? and to the value of perhaps more than ten times the cost of the canal: and as the plaintiffs have succeeded to all the rights and privileges of the United States, they are not bound by law, or in equity and good faith, to do more than the government would have been obliged to perform had they retained the canal. The servitude claimed being a natural one, due by the whole extent of land in the rear of the city, must be apportioned according to the extent of the grant to the plaintiffs and defendants, as it is said in the digest, book the 8th, tit. law 25th—" *Si partem fundi mei certam tibi vendidero, aquæductus jus etiamsi al-*

*terius partis causa plerumque ducatur te quoque
sequetur : neque ibi aut benignitatis agri, aut usus
ejus aquæ ratio habenda est : ita, ut eam solam
partem fundi, quæ pretiosissima sit, aut maxime
usum ejus aquæ desideret, jus ejus ducendæ se-
quatur : sed pro modo agri detenti, aut alienati,
fiat ejus aquæ divisio.* This is when the aquæ-
duct is beneficial, and if a benefit is to be divided,
by analogy, so ought a burthen.

ORLEANS
NAVIGATION
COMPANY.
*vs,*
MAYOR, &c.
OF NEW-OR-
LEANS.

THE defendants ought to take nothing by the
motion.

LEWIS, *J.* concurred.

MOTION OVERRULED.

THE opinion of the Court, was delivered im-
mediately after its opening, and before MARTIN,
*J.* took his seat. He had prepared the following :

UNABLE to concur with my brothers, in some
of the points on which the judgment of the Court
is founded, and particularly a principal one, upon
which one of them has insisted, during the last
argument, *ante*, 223 & 224, I have again given
to this case all the attention of which I am capable,
and I have to lament my utter inability to recog-
nise some of the principles upon which it has been
determined.

I ADMIT that, according to a well known rule
of the common law of England, the right which

SPRING 1812.
I. District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c.
OF NEW-OR-
LEANS.

the defendants claim, " having no corporal exis-
tence, could not pass by *delivery*, it must there-
" fore pass by *grant:*" Neither am I willing to
contest whether this rule be *grounded on reason?*
But I have said the common law of England was
not the rule of conduct which the parties recog-
nised. On the contrary, the rule of the civil
law, the law of the land, in this respect, differs
*toto cælo* from that which it has pleased the Court
to establish.

*Res incorporales*, says Bracton, TRADITION-
EM *non patiuntur*, *l.* 2, *c.* 18.

TRADITIO *servitutum*, says the Digest, *indu-
cet officium prætoris. l.* 8, *tit.* 3, *l.* 1, *s.* 2.

IN the institutes incorporeal things are defined :
those which cannot be touched. *Incorporales au-
tem sunt que tangi non passunt*, l. 2, *tit.* 2, *s.* 1,
and a note is introduced in the margin, by Gothe-
fred, whether they are susceptible of *delivery?*
*An* TRADI *possunt?* For the solution we are
referred to the digest. Here the query is answered
in the negative. *Incorporales res* TRADITIONEM
*non recipere manifestum est. l.* 46, *tit.* 1, *l.* 43, *s.*
1. But, adds the commentator, they are suscep-
tible of a FICTITIOUS *delivery. Nisi fictam
scil. alias mero jure*, but are considered as *deliv-
ered* when we are permitted to enjoy them. TRA-
DITÆ *censuntur cum alius patitur nos iis uti.*
We are referred to the 6th book of the digest. It

is there said that if a servitude be delivered the
right of the person thus acquiring it, shall be pro-
tected. *Si de usufructo agatur* TRADITO, *publici-
ana actio datur, itemque* SERVITUTIBUS *urbano-
rum prædiorum, per* TRADITIONEM *constitutis, vel
per patientiam. Forte si per domum quis suam pas-
sus est acquæductum traduci: item, rusticorum
prædiorum: nam et hic* TRADITIONEM *et patien-
tiam tuendam constat. l.* 11, *s.* 1.

SPRING 1812.
I. District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c.
OF NEW-OR-
LEANS.

THE annotator adds that incorporal things are
susceptible of a *quasi-delivery. Proprie, scil,*
QUASI-TRADITIONEM *recipiunt.*

AFTER this, it is difficult to misunderstand, or
find any ambiguity or obscurity in the position
that servitudes pass *by delivery.* TRADITIO
*plane et patientia servitutum inducet officium
prætoris. Dig. lib.* 8, *tit.* 3, *l.* 1, *s.* 2. Delivery
certainly, and forbearance of servitudes, give rise
to the interference of the prætor. Neither is the
note less plain. *Aut ita legendum est, ut* TRA-
DITIONE *servitutum inducet officium prætoris.
Neque interea displicet quod a Baldo traditur,
servitutes tradi patiendo seu patientia: deberi
officio judicis.*

FROM these different texts, I have inferred that
a servitude, although an incorporal thing, may
pass by *delivery,* according to the principles of
the civil law. Though not susceptible of a cor-
poral *delivery,* or *delivery* DE FACTO, it is sus-

SPRING 1812.
I. District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c.
OF NEW-OR-
LEANS.

ceptible of a *delivery* DE JURE, and will therefore pass *without a grant.* For example : If I purchase a right of view over my neighbour's estate, and he does actually pull down, for the purpose, as much of his wall, or of his house, as before obstructed my windows, the act of pulling down will be a *delivery* of the right of view. TRADITIO *quæ inducet officium prætoris.* If I demolish myself the part of the wall or house, in consequence of an agreement between him and me, his forbearance will perhaps be an equal evidence of my right. PATENTIA *quæ inducet officium prætoris.*

THE French law writers recognise this principle of the civil law. " A third manner of acquir-
" ing property" says Pothier, " is *delivery*, by
" which the property of a thing, passes from one
" person to another. Doctors call it, *modus ac-*
" *quirendi dominii derivativus.* This manner of
" acquiring property is derived from natural law."
*Traité de la propriété*, 192, *n.* 193.

*Hæ quoque res, quæ* TRADITIONE *nostræ fi-*
*unt, jure gentium nobis acquiruntur. Nihil enim*
*est tam conveniens naturali æquitate, quam vo-*
*luntatem domini rem suam in alium transferre*
*ratam haberi. l. 9, s. 3, ff. de acq. rer. dom.*

" Incorporeal things," continues Pothier, " not
" being susceptible of possession, since posses-
" sion consists in the corporal detention of a thing,

SPRING 1812.
I. District.

ORLEANS
NAVIGATION
COMPANY
vs.
MAYOR, &c.
OF NEW-OR-
LEANS.

" it follows as a consequence, that they are not
" more susceptible of delivery : delivery being
" only a transfer of the possession. Yet, as for
" want of a possession, strictly speaking, we re-
" cognise a quasi-possession of incorporeal things,
" which consists in the use which is made of them,
" there ought to be also a kind of *delivery* of in-
" corporeal things."

" THIS delivery, with regard to real rights,
" or the rights of servitude, is done *patientia et*
" *usû*, that is to say, when he, in the sight of
" whom the right is used, suffers it to be used.
" For example : If I bound myself to give you a
" right of way over my land, I am holden to make
" you a *delivery* of it, when you begin to pass
" over it and I suffer it. If I bound myself to
" give you a right of view over my house, when
" you will make windows and the mean wall, and
" I suffer it." *Traité de la propriété*, 208, *n.* 214.

WE must be careful not to confound two dif-
ferent means of acquiring property, *delivery* and
*prescription.*

THE former is derived, as we have seen, *jure
gentium :* the other from the municipal law. *De-
livery* is a means of acquiring property by the act
of the owner. Prescription, is a means of acquir-
ing it, without any act of his, even without his
consent or knowledge.

SPRING 1812.
I. District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c.
OF NEW-OR-
LEANS.

" Lastly," says the author just cited, " we
" close, without our consent, and even our know-
" ledge, the property of a thing, belonging to us,
" when he who possesses it, acquires it by *pre-*
" *scription.* As soon as the possessor has, by
" himself or those from whom he holds, accom-
" plished the time required to allow the prescrip-
" tion, the law, which establishes prescription, de-
" prives us, *ipso facto*, of the property we had in
" the thing, and transfers it to the possessor."
*Traité de la propriété*, 272, *n.* 276.

In order that the *delivery* may vest the pro-
perty, it is necessary it should be made by a per-
son having power to alien it. Now the land, on
which the canal was dug, if the plaintiffs have any
right on it, was, at the time the canal was dug, the
property of the king, vacant, unappropriated land,
*terras realinguas.* The power of the governors
of Louisiana, to grant the king of Spain's vacant
land, is not at this time to be doubted. Few of
the planters have any other title to their land, but
what proceeds mediately or immediately from a
governor's grant or concession. If he could alien
the soil, surely he could burthen it with a ser-
vitude. *Omne majus includit in se minus.* In
this particular instance, the governor acted with
his master's knowledge and consent. Before the
canal was begun, the king consents that the galley
slaves be employed to dig it : after it is completed

he directs that it may be used in draining the lands around the city.

Spring 1812.
I. District.

ORLEANS
NAVIGATION
COMPANY
vs.
MAYOR, &c.
OF NEW-OR-
LEANS.

THINKING that the right, which the defendants claim, might pass to them *without a grant*, I must conclude with their counsel, that there was no necessity for a formal, literal acceptance. If it be admitted that the right was acquired *traditione* or *patientia & usû*, it must follow that it was accepted; although there be no *written* evidence of the acceptance.

I CANNOT assent to the position of one of my brothers, *ante*, 224, 225, that as a sovereign can revoke his gift, the United States may have done so, that is, destroyed the title of the defendants, by granting to the present plaintiffs a right incompatible with that claimed by the city : nor that the city cannot complain, for congress gave it property of much greater value.

FIRST. It is very doubtful whether, after the United States have made an absolute donation, they can recall it. But the right claimed by the city, if it exist at all, was acquired for a valuable consideration; labour and money spent in digging the canal.

SECONDLY. The congress has not *given* a foot of land to the city. The confirmation of " the " claim of the corporation to the *commons* adja-

G g

SPRING 1812. " cent to the city, within six hundred yards of the
I. District. "fortifications of the same," was not gratuitous,
ORLEANS but made, in consideration of their relinquishing
NAVIGATION their claim to the rest of the said commons, and
COMPANY of their conveying part of the land within the six
   vs. hundred yards, to the present plaintiffs. 8 *Laws*
MAYOR, &c.
OF NEW-OR-
LEANS. *U. S.* 304.

IN the opinion I delivered last term, *ante* 32,
I stated the grounds on which I think that the city
might claim a right, accruing under the agreement
or convention between the Baron de Carondelet
and some of its inhabitants, although the city was
not a party thereto.

I CONCLUDE that the principles, upon which
the judgment of the Court rests, appearing to me
untenable, I think it ought to be reconsidered.